**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC #:**
**DATE FILED:** 5/19/17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DAVID PAREDES,

    Plaintiff,

-against-

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.

16-CV-00810 (BCM)

**OPINION AND ORDER**

Plaintiff David Paredes brings this action pursuant to Section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking judicial review of a final determination of the Commissioner of Social Security (the Commissioner) denying his application for Social Security Disability Insurance benefits (DIB) and Supplemental Security Income (SSI).[1] Paredes moves pursuant to Fed. R. Civ. P. 12(c) for an order reversing the Commissioner's decision or remanding for further proceedings; the Commissioner cross-moves pursuant to Fed. R. Civ. P. 12(c) for an order affirming her decision. The parties have consented to this Court's jurisdiction for all purposes pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the plaintiff's motion is GRANTED and the case will be REMANDED to the Commissioner for further proceedings.

## I. BACKGROUND

### A. Procedural Background

Paredes applied for disability insurance benefits on March 7, 2013, alleging that he became disabled on February 23, 2013. *See* Cert. Tr. of Record of Proceedings (Dkt. Nos. 13 through 13-8) at 90, 103 (hereinafter "R.__").[2] The application was denied on May 24, 2013. (R. 118-25.)

---

[1] Because the definition of "disabled," governing eligibility for benefits, is the same for DIB and SSI, the term "disability insurance benefits" will be applied to both. *See Chico v. Schweiker,* 710 F.2d 947, 948 (2d Cir. 1983) (generally referring to "disability insurance benefits" because SSI regulations mirror DIB regulations); *Calzada v. Astrue,* 753 F. Supp. 2d 250, 266-67 (S.D.N.Y. 2010) (same).

[2] With respect to DIB, Paredes was required to establish that he was disabled prior to his "date last insured," which was December 31, 2016. *See Arone v. Bowen,* 882 F.2d 34, 37-38 (2d Cir. 1989).

Thereafter, Paredes requested a hearing before an administrative law judge (ALJ) (R. 126-28), and on June 25, 2014, he appeared, without counsel, before ALJ Seth Grossman. Plaintiff's nephew, Estalio Delasantos, also appeared and testified at the 2014 hearing. (R. 53-58.) On March 25, 2015, Paredes appeared again, without counsel, for a supplemental hearing before ALJ Grossman. (R. 19, 60-89.) Bernard Gussoff, M.D., and Raymond Cestar, a vocational expert, also appeared and testified at the 2015 hearing. (R. 60-89.)

After the 2015 hearing, Paredes underwent a consultative psychiatric evaluation. On September 9, 2015, the ALJ issued a decision finding that Paredes was not disabled within the meaning of the Act. (R. 13-29.) That decision became final on January 5, 2016, when the Appeals Council denied Paredes's request for review. (R. 1-4.) This action followed.

### B. Personal Background

Paredes was born on April 23, 1975 in the Dominican Republic. (R. 116, 65.) He came to the United States when he was ten or eleven years old. (R. 65.) Paredes completed "some" community college (R. 42, 65), and worked continuously from September 1998 to June 2012 as a security guard and a cleaner. (R. 42, 64-65, 85, 237.) He was married for three years, but separated from his wife shortly before applying for disability insurance benefits in 2013. (*See* R. 72, 415, 442.)

---

"SSI benefits, however, are available without regard to a claimant's employment history." *Singleton v. Colvin*, 2015 WL 1514612, at *13 (S.D.N.Y. Mar. 31, 2015) (citing *Casson v. Astrue*, 2012 WL 28300, at *1 (N.D.N.Y. Jan. 5, 2012)). Consequently, the Court must consider whether the ALJ's determination that Paredes was not disabled between February 23, 2013 (his alleged onset date) and September 9, 2015 (when the ALJ issued his decision) "is legally correct and supported by substantial evidence." *Id.*

## I. PRE-HEARING EVIDENCE

### A. Pre-Application Evidence

Paredes was diagnosed with bipolar disorder at some point in his twenties. (*See* R. 590 (age 20); R. 415 (age 26).) He has been treated at the Adult Outpatient Clinic at Bronx-Lebanon Hospital Center (BLHC) since October 5, 2011. (R. 590.) Psychiatric treatment notes from 2012 indicate that Paredes had "stable baseline functioning" when he was compliant with his medications. (R. 299.) However, he took his medications "inconsistently." (R. 319.) Paredes has been hospitalized in psychiatric units at least four times, including twice in February 2013, as described below. (R. 590.)

Five days prior to his alleged onset date, on February 18, 2013, Paredes called Emergency Medical Services (EMS), which took him to BLHC, where he reported to staff that he had been "hearing voices" for five days, had been noncompliant with his medications for "a couple of months," and had stopped seeing his psychiatrist the previous October. (R. 306, 411, 415.) He explained that he was stressed because he had separated from his wife (R. 415), and "realized he needs to get back on his medications." (R. 411.) At one point, Paredes attempted to walk out of the Emergency Department, and was thereafter "sedated for protection and placed on constant observation." (R. 423.) He was discharged the following day, with a Global Assessment of Functioning (GAF) score of 55. (R. 412.)[3]

---

[3] A GAF score represents a clinician's overall judgment of the patient's level of psychological, social, and occupational functioning. GAF scores range from 1 to 100, with 1 being the lowest level of functioning and 100 the highest. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 32-34 (4th ed. rev. 2000). A GAF score of 21 to 30 indicates "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." DSM-IV at 34. A score of 31 to 40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations,

An unsigned treatment note dated February 21, 2013 reveals that Paredes "shared distress over his wife leaving him about three months ago, around the time he stopped taking medications and became 'too loud.'" (R. 306.) During the February 21 appointment, Paredes acknowledged that he needed medication. *Id.* However, two days later, on February 23, 2013, Paredes's family called EMS, which took Paredes back to BLHC. (R. 341, 383, 592.) His family reported that Paredes had not taken his medications since his February 18-19 hospitalization, that he was unable to sleep, "talks a lot without making much sense" and was acting "recklessly and inappropriately." (R. 341, 383.) For example, he cut all the cables and wires in the apartment he shared with his brother, gave a television to a stranger, and gave his bank card PIN to "almost anyone he recently encountered." (R. 341, 383.) The symptoms had begun "gradually over the last few days and weeks" and, though "intermittent," were "noticed daily since onset." (R. 383-84.) Paredes told staff at BLHC that he did not know why his brother called EMS. (R. 341, 383.)

Paredes remained at BLHC for approximately two weeks, until March 8, 2013, during which time he became medication-compliant and "stable." (R. 333, 377.) Upon discharge, Paredes was calm and cooperative, with a normal mood, appropriate affect, and normal speech. (R. 333, 377.) He reported no hallucinations or delusions, his thought process was logical, and his attention, concentration, cognition, memory, insight, and judgment were all intact. (R. 333, 377.) His GAF score was assessed at 60. (R. 337.)

judgment, thinking or mood." *Id.* A score of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* A GAF score of 51-60 signifies "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers)." *Id.* Scores in the 60's and higher indicate symptoms that are "mild," "transient," "minimal," or "absent." *Id.*

4

Because Paredes told BLHC staff that he was non-compliant with his medication due to insufficient funds (R. 333), meetings were held with his family and a social worker to discuss applying for Medicaid, SSI, and public assistance. *Id.* On March 7, 2013, the day before he was discharged, Paredes applied for disability insurance benefits.

## B. Post-Application Evidence

On March 11, 2013, Paredes met with Damaries Smith, a social worker at BLHC. (R. 307-08.) Paredes reported his recent hospitalization and acknowledged that he decompensated because he stopped taking his medications: Risperdal (the brand name for risperidone, an antipsychotic used to treat schizophrenia and bipolar disorder), and Depakote (the brand name for valproic acid, an anticonvulsant used to treat seizures and bipolar disorder). (R. 307.) Paredes was "slightly on edge" during the meeting, but cooperative, and the mental status examination findings were unremarkable. (R. 307.)

On March 20, 2013, Paredes saw Jose Lopez, M.D. at BLHC. (R. 351-56.) Dr. Lopez referred Paredes for a renal consultation (R. 354-55), and on March 26, 2013, Paredes saw Dr. Molham Abdulsamad, M.D. a nephrologist at BLHC. (R. 348-50.) Paredes reported nocturia (frequent urination at night), which can be a symptom of Chronic Kidney Disease (CKD), but no dysuria (painful urination), hematuria (blood in the urine), or other changes in urination. (R. 348.) Dr. Abdulsamad ordered a renal biopsy. (R. 350.)

On April 2, 2013, Paredes underwent a renal biopsy. (R. 358-75.) The results showed immunoglobulin A (IgA) nephropathy.[4] In addition, a blood test revealed a Blood Urea Nitrogen

---

[4] IgA nephropathy is a form of CKD that occurs when IgA proteins build up in the kidneys, causing inflammation that damages kidney tissue. *See* National Institute of Diabetes and Digestive and Kidney Diseases, *IgA Nephropathy*, https://www.niddk.nih.gov/health-information/health-topics/kidney-disease/iga-nephropathy/Pages/facts.aspx (last visited May 18, 2017).

(BUN) level of 27 mg/dL, above the laboratory's normal reference range of 8 to 26 mg/gL. (R. 359, 366.)[5] On April 4, 2013, Paredes was diagnosed with CKD, Stage IV (severe). (R. 368, 407-410, 444-47.)

Shortly thereafter, on April 16, 2013, Paredes saw Dr. Marina Zilpert, a psychiatric resident at BLHC. (R. 442.)[6] Paredes reported that he was taking his medications and not experiencing any mental health symptoms. *Id.* His judgment was mildly impaired, but his mood was "better," his attention and concentration were "intact," memory was "grossly intact," and other findings were generally unremarkable. *Id.* Paredes reported support from his family and his wife, who visited him but did not live with him. *Id.*

On April 17, 2013, Paredes presented to Kalpana Uday, M.D., a nephrologist at BLHC, with CKD Stage IV with Proteinuria (excess proteins in the urine). (R. 437-39.) Paredes reported that he felt fine and had experienced no changes in his symptoms. (R. 437.) His BUN level remained at 27 mg/dL; his creatinine levels (another measure of kidney function) were also elevated, at 2.7 mg/dL (R. 359-68, 764)[7]; and his "problem list" included nephropathy IgA, chronic

---

[5] According to the Mayo Clinic, "In general, around 7 to 20 mg/dL (2.5 to 7.1 mmol/L) is considered normal. But normal ranges may vary, depending on the reference range used by the lab, and your age . . . Generally, a high blood urea nitrogen level means your kidneys aren't working well." Mayo Clinic, *Blood urea nitrogen (BUN) test*, http://www.mayoclinic.org/tests-procedures/blood-urea-nitrogen/details/results/rsc-20211280 (last visited May 18, 2017).

[6] A number of Paredes's medical reports from BLHC are "authored" by a resident and a few days later co-signed by a more senior physician. Because we assume that the resident interacted with the patient, we identify the resident as the treating doctor. However, the ALJ refers to the senior psychiatrist, Dr. Ketki Shah, as the "treating" doctor. (R. 24.)

[7] According to the Mayo Clinic, "A creatinine test reveals important information about your kidneys." Creatinine is a chemical waste product which is filtered out of the blood by healthy kidneys. "If your kidneys aren't functioning properly, an increased level of creatinine may accumulate in your blood." Mayo Clinic, *Creatinine test*, http://www.mayoclinic.org/tests-procedures/creatinine-test/home/ovc-20179389 (last visited May 18, 2017). "The normal range for creatinine in the blood may be 0.84 to 1.21 milligrams per deciliter (74.3 to 107 micromoles per

6

nephritis, proteinuria, dyslipidemia (elevated levels of cholesterol and/or triglycerides), CKD Stage IV, prediabetes, bipolar disorder, and hypertension. (R. 437.) Dr. Uday referred Paredes for a pre-transplant evaluation. (R. 439.)

On May 9, 2013, state agency psychologist Dr. T. Harding reviewed the evidence then in the record and concluded, among other things, that Paredes was able to understand and follow simple instructions, be attentive and concentrate for two-hour intervals, interact appropriately with peers and supervisors, and adapt to routine workplace changes. (R. 99.)

On May 16, 2013, Paredes reported to Dr. Zilpert, the psychiatric resident, that his mother had come to stay with him; that he was taking his medications regularly; and that his functioning and mood were stable. (R. 761.) His mental status examination findings were generally unremarkable, and his medications were continued. (R. 761-62.)

## C. Post-Denial Evidence

Between May 31, 2013 and June 13, 2013, Paredes was evaluated by the Federation Employment and Guidance Service (FEGS).[8] The results of the evaluation are contained in a FEGS Biopsychosocial Report (BPS Report), which reflects that Paredes was capable of washing dishes and clothes, sweeping, mopping, vacuuming, watching television, making beds, shopping for groceries, cooking, reading, socializing, getting dressed, bathing, grooming, and using the toilet. (R. 551-52, 735-36.) On May 31, 2013, FEGS physician Cindy Grubin, M.D. found that, although he was calm and cooperative, Paredes had a somewhat constricted mood and affect. (R. 524, 534,

_____

liter), although this can vary from lab to lab, between men and women, and by age . . . Generally, a high serum creatinine level means that your kidneys aren't working well." *Id.*

[8] FEGS was a New York City program that provided "assistance [for] applicants and recipients with complex clinical barriers to employment, including medical, mental health, and substance abuse conditions, to obtain employment or federal disability benefits." *Morales v. Colvin*, 2015 WL 2137776, at *7 n.16 (S.D.N.Y. May 4, 2015).

741.) Dr. Grubin did not assess any physical restrictions, but she indicated that Paredes could be around only a limited number of people, and referred Paredes for a psychiatry examination. (R. 526, 528, 743, 745.) Thereafter, FEGS psychiatrist Jorge Kirschtein, M.D. examined Paredes and found that he had a depressed mood and constricted affect, but was neat, calm, and cooperative, and exhibited normal speech, a logical thought process, and normal thought content. (R. 520.) Dr. Kirschtein assessed "severe" limitations in Paredes's ability to follow work rules and relate to coworkers, and "moderate" limitations in his ability to accept supervision, deal with the public, maintain attention, and adapt to changes and stressful situations. (R. 520.) Dr. Kirschtein assigned Paredes a GAF score of 50. (R. 521.)

On June 5, 2013, Paredes saw Dr. Anele Slezinger and Dr. Kerone Thomas, a resident at BLHC, for CKD treatment. (R. 767-71.) According to the treatment notes, Paredes's BUN level had decreased to 23 mg/dL; his creatinine level remained at 2.7 mg/dL; and his estimated glomerular filtration rate (eGFR), which is another measure of kidney function, was 21.02 mL/min/1.73m2, which is well below the normal range. (R. 769-70.)[9]

On June 11, 2013, Paredes saw Ketki Shah, M.D., a psychiatrist, and reported feeling "ok." (R. 772-73.) He was taking his medications regularly and denied any side effects. (R. 772.) Dr. Shah found Paredes's affect was constricted, but his mood was "all right" and the mental status examination findings were otherwise unremarkable. *Id.* Dr. Shah also noted that Paredes was "stable" and "at baseline level of functioning," and continued his medications. (R. 773.) Dr. Shah

---

[9] "The [e]GFR test estimates your level of kidney function and can help your doctor determine your stage of kidney disease." Mayo Clinic, *Membranous nephorpathy*, http://www.mayoclinic.org/diseases-conditions/membranous-nephropathy/basics/tests-diagnosis/con-20026050 (last visited May 18, 2017). The laboratory used by BLHC considers the normal GFR range for non-African American males aged 30-39 to be 70-162 mL/min/1.73m2. (R. 350-52.)

8

noted that Paredes had brought papers to be filled out in connection with his social security application. However, Paredes insisted on seeing Dr. Zilpert for the paperwork, and she was unavailable. *Id.*[10]

On October 8, 2013, Paredes underwent surgery to construct a fistula (an access for dialysis) in his left forearm. (R. 842-43.) However, as described below, Paredes needed to have the procedure repeated on February 18, 2014. (R. 795, 841, 845-59.)

On December 9, 2013, Paredes reported to Dr. Lilla Danilov, a psychiatric resident at BLHC, that he took his medications regularly with no side effects, lived in a one-bedroom apartment, had a girlfriend, and was looking for a "new job" in a pharmacy. (R. 789.) His mood was "fine" and other mental status findings were unremarkable. *Id.* His medications were continued. (R. 790.)

On January 13, 2014, Dr. Danilov noted that Paredes missed his last appointment because "his work schedule had changed." (R. 795-96, 832-33.) Paredes appeared for his appointment on January 13, 2014, however, and was "compliant" and "stable." (R. 795.)

On January 15, 2014, Paredes saw Hanasoge Girishkumar, M.D., in connection with his CKD. (R. 844.) Paredes reported no unusual dysuria, nor any urinary urgency or frequency. (R. 844.) In the "history" section of his notes, Dr. Girishkumar noted that Paredes's kidney function was deteriorating and that he might need dialysis in the near future. (R. 844.) Dr. Girishkumar discussed the need for an "AV [arterio venous] access procedure" on Paredes's left arm and

---

[10] The Court notes that a letter from the Social Security Administration to Paredes, dated June 5, 2013, enclosed a form for Paredes to give to his "current treating doctor." (R. 145.) The form itself is not in the record, but was likely a medical source statement form. It is possible that on June 11, 2013, Paredes was attempting to have Dr. Zilpert fill out this form because she was the resident who typically treated him. There is no medical source statement from any of Paredes's treating physicians in the record.

9

explained the risks and benefits of the procedure to the patient. *Id.* On February 18, 2014, Dr. Girishkumar performed the procedure without complications, leaving Paredes with an AV fistula in his left arm. (R. 845-59.)

On March 13, 2014, Dr. Danilov noted that Paredes "continues to work with a truck company and is looking for a job as a pharm technician." (R. 836.)

On April 30, 2014, Dr. Uday wrote an unaddressed letter, stating that "[t]his letter is given at Mr. David Paredes's request. He has chronic kidney disease stage 4, he is not yet on dialysis. He has an arterio venous fistula done in left upper arm in preparation for dialysis. He attends primary care and renal transplant program. Please assist him. Contact me if you [have] any questions." (R. 591.)

On May 8, 2014, in a letter addressed to "Whom It May Concern," Dr. Danilov reported that Paredes was diagnosed with bipolar disorder at age 20 and had been a patient at BLHC's Department of Psychiatry – Adult Outpatient Clinic since October 5, 2011, where he was seen by a psychiatrist at the clinic every two months. (R. 590.) Dr. Danilov noted that Paredes had been hospitalized in psychiatric units four times, most recently from February to March 2013. *Id.* In a second letter addressed to "Whom It May Concern," dated May 28, 2014, Dr. Danilov noted substantially the same information, adding that Paredes's psychiatric diagnosis was bipolar disorder. (R. 589.)

On June 6, 2014, Edward Brown, M.D., a cardiologist, wrote a letter to Dr. Uday, who had referred Paredes for evaluation prior to renal transplantation. (R. 587.) Dr. Brown reported that an EKG showed left ventricular hypertrophy, that a stress test was normal, and that, "[r]egarding anesthesia and transplant surgery, his risk for a perioperative cardiovascular event is low, and no special precautions are indicated." *Id.*

10

On February 18, 2015, Dr. Uday reported, in a letter addressed to "Whom It May Concern," that Paredes had high blood pressure and CKD and was being followed at the Mount Sinai renal transplant program. (R. 810.) Dr. Uday's treatment notes show that as of January 15, 2015, Paredes's BUN was back to 27 mg/dL, his creatinine level was up to 3.4 mg/dL, and his eGFR was down to 16.03 ml/min/1.73m2. (R. 812.)

On February 24, 2015, treatment notes authored by orthopedist Ashley Simela, M.D., and written primarily in Spanish, show that Paredes was given cyclobenzaprine for back pain. (R. 805.) His health issues are described in the notes as "Degeneration of intervertebral disc of lumbar region," with an onset date of February 24, 2015. *Id.*

## II.    HEARINGS

### A.    June 25, 2014 Hearing

At the June 25, 2014 hearing, Paredes testified that he was 39 years old, finished three years of community college, and previously worked as a security guard and a cleaner. (R. 41-42.) He stated that he was not employed but that he walked daily for exercise, at a normal pace, for approximately 20-30 minutes. (R. 46-47.)

In response to the ALJ's question whether he was capable of working, Paredes replied, "Not right now because I have a lot of back pains." (R. 42.) The ALJ asked if the pain was caused by his kidney and Paredes said, "The kidney, yeah. And it's difficult for me to stand because I used to do a lot of standing, a lot of walking." (R. 43.) The ALJ asked if Paredes would be able to do a sitting job and he replied, "It is difficult for me sitting down as well because of the back pain." *Id.* The ALJ asked if Paredes could do security work at a desk and Paredes said he could not because of his back pain; he testified that he could sit for only ten or fifteen minutes and that his feet would hurt and swell because of his kidney disease. (R. 44.)

11

Paredes further testified that he was "almost getting dialysis" and that he was on a kidney transplant waiting list with a "five to six year" wait. (R. 44.)

Paredes testified that he had been hospitalized several times because of his bipolar disorder. (R. 48-49.) The ALJ asked about his last hospitalization and Paredes replied, "I stopped taking the medication . . . I was drinking also. When I stop taking my medication, I drink a lot. I hang out a lot. That's the main reason. I totally forgot about the medication. I curse people, I scream, I do a lot of crazy thing [sic]. I hang out too much, stuff like that." (R. 50.) At one point, the ALJ commented, "You seem pretty normal today." (R. 49.) Paredes responded, "Yeah, I'm fine. I'm taking medication . . . . when I don't take my medication, I end up in the hospital." (R. 49.) The ALJ then asked, "When you take the medication, and again, this is an important question, so think before you answer. Is the bipolar under control when you take your medication?" (R. 49-50.) Paredes replied, "Yes." (R. 50.) The ALJ continued, "Completely under control?" *Id.* Paredes again replied, "Yes." *Id.*

The ALJ then commented, "we're probably going to have another hearing because I need a medical expert to interpret these tests." (R. 51.) The ALJ also stated that he would update the medical records and send Paredes for consultative psychiatric and internal medicine examinations. (R. 52.) The ALJ then took testimony from Delasantos, Paredes's 24-year-old nephew, who testified that he used to live with Paredes. (R. 53.) Delasantos explained that Paredes is "more or less" okay when he is taking his medications but "went crazy" when he stopped. *Id.* In response to the ALJ's question whether Paredes is tired during the day, Delasantos replied, "In situations he's on the floor saying that his back hurt." (R. 54.) He continued, "He's always in the house. If he come out [sic], he only comes out for an hour or so. He's always tired, his back hurting." *Id.*

12

The ALJ then asked Paredes if he gets tired a lot. Paredes replied that he is "always very" tired, and that his fatigue would interfere with his ability to concentrate on a job. (R. 54.) Paredes added that his ability to concentrate would also be affected by his frequent urination, impaired vision, and painful, swollen feet. *Id.* The transcript reflects that, at one point during the forty-minute hearing, Paredes asked to be excused to use the restroom. (R. 48.)

The ALJ concluded by telling Paredes, "I have a good idea of what's going on. I'm sending you out to this doctor. I want to update your records. It's very possible I could resolve this in your favor without another hearing. If I can, I will. If not, we'll have a hearing with a doctor her [sic] and we'll do what we have to do, okay? . . . Sometimes it's just easier and better with a doctor here because it has to be done based upon evidence, not just what I think. You have to have the proof there, but it's a strong case, at least preliminarily. So I'm sending you out for a doctor, both a psychiatric doctor and a regular doctor." (R. 56, 57.)

Notwithstanding the ALJ's comment, Paredes was not scheduled for any consultative examinations between the first and the second hearings.

## B. March 25, 2015 Hearing

At the March 25, 2015 hearing, Paredes testified that he could not work because of his CKD, depression, and bipolar disorder. (R. 65.) He also said he was doing physical therapy for his back pain, and confirmed that he was still not on dialysis. (R. 66.) When asked what he had done the previous day, Paredes replied, "Nothing, I stayed in my house all day . . . I didn't have nothing to do . . . I mean, I don't like to go out that much." *Id.* Later, the ALJ asked Paredes what he does at home. (R. 71.) When prompted, Paredes confirmed that he watches television, goes out to walk for 15-20 minutes, and goes to his brother's house to "relax with his [brother's] children" and eat meals with them. *Id.*

13

Paredes testified that he could stand for approximately twenty minutes, explaining that he cannot stand for "too long because my feet hurt, my ankle hurt[s]." (R. 67.) He continued, "I have a lot of back pains when I stand for a long period of time," which he again attributed to his CKD. *Id.* The ALJ asked if Paredes had any problems sitting, and Paredes replied, "I got to have my leg up . . . to feel comfortable." (R. 68.) The ALJ asked if Paredes would be capable of doing a job that could be done sitting and Paredes replied, "No, I have another inconvenience. I go to the bathroom a lot . . . And I have a hard [time] also memorizing things." *Id.* After discussing whether Paredes could do a job answering phones if he were trained to do it, Paredes maintained that he could not, because, "While answering a [p]hone, you got to be really polite and sometimes my attitude change[s] due to my psychiatry situation. I get really angry sometime[s] for no reason." (R. 69.)

The ALJ then described the difference between physical and mental capabilities, and Paredes testified again that he was not physically capable of a desk job, including answering phones, because "I get tired really quickly sitting down for a long time. Like I said before, my leg is going to hurt. I need to have my leg up. I cannot be sitting down for a long period of time. I got to stand up. I got back pain also, normally, most of the time." (R. 70.)

Before the ALJ questioned Dr. Gussoff, the medical expert, Paredes noted, "the last time that I was here, you said you were going to send me an appointment to go see a doctor. You never sent it to me." (R. 73.) The ALJ replied, "I wonder what happened . . . If we need it, we'll do it. But we have all these records." *Id.* The ALJ then asked Dr. Gussoff if there was anything else he should ask Paredes. (R. 72-73.) Dr. Gussoff replied, "I was going to ask him if he is on dialysis, but his BUN is normal, so there's no need for it." (R. 73.)

14

Dr. Gussoff, once sworn in, confirmed that he was certified in internal medicine, hematology, and oncology, and had reviewed Paredes's medical records but never previously met him. (R. 73-74.) Dr. Gussoff testified, based on those records, that Paredes had the most advanced stage of CKD, Stage IV. (R. 74.) He continued, "On the other hand . . . we have a BUN, a measure of kidney function, of 27, which is just about normal. And therefore, he's not on dialysis." *Id.* The ALJ asked how someone could have normal kidney function and have the most advanced stage of chronic renal disease, and Dr. Gussoff responded, "Stage IV, apparently, is based on the pathology of a biopsy." *Id.* He continued, "what's confusing is the [biopsy] report at that time, [shows] a BUN of 27. This is just about the upper limit of normal. And obviously, the dialysis is not required. It is only required when there is nephremia [swelling of the kidneys] . . . or significant elevation of the BUN. This is not the case here." (R. 75.)

The ALJ asked, "Does this mean that his kidney function at the present time is about normal?" *Id.* Dr. Gussoff responded, "Using the BUN as a criteria [sic], I would say, yes." *Id.* The ALJ responded, "Well does that, and believe me, I am not trying to lead you. It seems some kind of logic to say . . . that the kidney function is normal now, it would seem to me that the problem would not prevent you from working at the current time, even though you're on a transplant list . . . That's a certain logic to that, is that correct?" (R. 75-76.) Dr. Gussoff replied, "Absolutely, unless of course, there are other conditions, which I don't find in the record . . . And hearing the testimony, I would think to say that the claimant is functional as you have addressed the issue of whether he can answer a telephone. And from the testimony and the file, I would say . . . that he could." (R. 76.) Dr. Gussoff then testified that Paredes could "clearly" do sedentary work, and affirmed that he could "possibly" do light work as well. (R. 76-77.)

15

Dr. Gussoff further testified that it would be "uncommon[]" for Paredes's back pain to be caused by a kidney problem because "back pain is "[n]ot a manifestation of kidney disease." (R. 77.) Dr. Gussoff was not asked, and did not discuss, whether Paredes's back pain could be due to the disc degeneration noted by Dr. Simela on February 24, 2015. The ALJ asked if frequent urination was a manifestation of kidney disease, to which Dr. Gussoff replied, "I don't have any evidence that he has what is called polyuria, frequent urination." *Id.*[11]

With respect to the kidney transplant list, Dr. Gussoff asserted that his "understanding . . . [is] candidates for transplant is [sic] obviously not a simple procedure. You have to first of all meet all the qualifications, which is almost always the claimants are on dialysis with uremia, azotemia and elevated BUN and symptomology, therein. You have to [have] a donor." (R. 78.)[12] The ALJ asked Paredes if his family had been tested as potential donors and he responded, "Not yet, but I have talked to a couple of friend[s]." *Id.* His brother and mother were precluded from acting as donors due to health issues. (R. 78.) Paredes interjected to say that he had twice fainted on the train or bus. (R. 78-79.) Dr. Gussoff testified that CKD "shouldn't" cause fainting "unless the claimant was significantly anemic. There's no evidence of anemia, which is also . . . a manifestation of

---

[11] This was not entirely accurate. As noted above, Paredes reported nocturia (frequent urination at night) as early as March 26, 2013, when he saw nephrologist Dr. Abdulsamad at BLHC. (R. 348-50.) In addition, Paredes testified about his frequent urination during his 2014 hearing, during which he also asked to be excused to use the restroom. (R. 54, 48.)

[12] "Prerenal azotemia is an abnormally high level of nitrogen waste products in the blood . . . When nitrogen waste products, such as creatinine and urea, build up in the body, the condition is called azotemia. These waste products act as poisons when they build up. They damage tissues and reduce the ability of the organs to function." Medline Plus, *Prerenal azotemia,* https://medlineplus.gov/ency/article/000508.htm (last visited May 18, 2017). "Uremia is a clinical syndrome associated with fluid, electrolyte, and hormone imbalances and metabolic abnormalities, which develop in parallel with deterioration of renal function." Medscape, *Uremia,* http://emedicine.medscape.com/article/245296-overview (last visited May 18, 2017).

16

chronic renal disease. I would say that most patients with advanced renal disease are significantly anemia [sic]." (R. 79.) Dr. Gussoff also testified that no seizure was documented in the record. *Id.*

The ALJ then asked Dr. Gussoff if there is "any reason to do an internal medicine [consultative] examination" or if he is "satisfied that this is an accurate picture." (R. 80-81.) Dr. Gussoff replied, "I think we have an accurate picture . . . The only discrepancy is why Mt. Sinai Hospital would put him on a transplant list when, in fact, clinically and laboratory-wise he does not have advanced – I would say emphatically that all of the patients that I have come across at these hearings and in practice, patients who are on the transplant list are all on dialysis to keep them under control until they should [sic] be transplanted. So I don't understand this." (R. 81.)

The vocational expert, Cestar, then testified by telephone. Cestar confirmed that "[a] hypothetical person of the claimant's education and vocational background who is limited to sedentary work, simple task instruction and, at the most, occasional contact with supervisors, coworkers and the public" could not do Paredes's past relevant work as a security guard and cleaner. (R. 85-86.) The ALJ then asked Cestar to name three jobs for that hypothetical person. *Id.* Cestar replied that the hypothetical person could be a clerical worker, an assembler, or a surveillance system monitor. *Id.* He further testified that, nationally, there are approximately 25,000 jobs for clerical workers, 10,000 for assemblers, and 74,000 for surveillance system monitors. *Id.* The ALJ asked if "most of these jobs have a reasonable access to bathroom facilities." *Id.* Cestar replied, "Yes." *Id.* The ALJ then asked whether an individual could be "off task up to 10 percent of the time and absent once per month due to a severe impairment in these jobs and more than that is problematic," and Cestar replied, "Yes." (R. 86-87.) The ALJ then asked Paredes if he had any questions for Cestar. Paredes informed Cestar that he "sometimes" soils himself, and Cestar testified that it would not be a problem if it is infrequent. *Id.* The ALJ asked if Paredes had

17

spoken to his doctors about this problem and he said he had and the doctors told him that it was "[b]ecause of the kidney situation." *Id.* The ALJ asked Dr. Gussoff if that was reflected in the record, and he replied that he "didn't see anything" and noted that "the frequency of urination is more likely to be due to the bladder than the kidney" but that he had not seen anything about the bladder in the medical record. (R. 87-88.) The ALJ then closed the hearing.

## III.   POST-HEARING EVIDENCE

On April 16, 2015, less than a month after Paredes's second hearing, Fredelyn Engelberg Damari, Ph.D., a psychologist, conducted a consultative evaluation of Paredes. (R. 815-22.) Dr. Damari noted that Paredes was cooperative, but defensive and resistant at times. (R. 816.) Paredes's manner of relating, social skills, eye contact, and overall presentation were poor. (R. 816-17.) His motor behavior was lethargic and his mood was apathetic. (R. 817.) However, his speech was fluent and clear, his thought process was coherent and goal directed, his affect was of full range and appropriate, his sensorium was clear, he was fully oriented, and his concentration and attention were intact. *Id.* Dr. Damari found that Paredes's cognitive functioning was below average to borderline, that his insight was fair, and that his judgment was fair to poor. (R. 818.) Paredes was able to dress, shower, and groom independently, and he was able to manage money and travel by public transportation. *Id.* Dr. Damari opined that Paredes could follow and understand simple directions and instructions, perform simple tasks independently, make appropriate decisions, relate adequately to others, but that he was "significantly" impaired in his ability to deal appropriately with stress. *Id.*

Paredes never underwent any internal medicine or nephrology consultative examination. As noted above, the testifying medical expert – Dr. Gussoff – was certified in internal medicine, hematology, and oncology, but not nephrology.

18

## IV.    APPLICABLE LAW

A claimant is "disabled" within the meaning of § 1614(a)(3)(A) of the Act, and thus entitled to disability insurance benefits, when he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The claimant's impairment, or combination of impairments, must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B). In evaluating disability claims, the Commissioner is required to apply a five-step process set forth in 20 C.F.R. §§ 404.1520(a), 416.920(a). The Second Circuit has described the sequence as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. Pt. 404, subpt. P, app. 1. . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, []he has the residual functional capacity to perform h[is] past work. Finally, if the claimant is unable to perform h[is] past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

*Jasinski v. Barnhart*, 341 F.3d 182, 183-84 (2d Cir. 2003) (citation omitted). If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation need not progress to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof as to the first four steps; the Commissioner bears the burden at the fifth step. *See Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Therefore, to support a finding that the claimant is not disabled at step five, the Commissioner must offer evidence demonstrating that other work exists in significant numbers in the national

economy that the claimant could perform, given the claimant's residual functional capacity (RFC), age, education, and past relevant work experience. *See* 20 C.F.R. §§ 404.1560(c), 416.960(c). "Residual functional capacity" refers to "the most [claimant] can still do despite [claimant's] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

## A. Mental Impairments

When a claimant seeks benefits based on mental impairments, the Commissioner must assess the severity of the impairment at step two by considering four categories: the claimant's (i) activities of daily living; (ii) social functioning; (iii) concentration, persistence, or pace; and (iv) episodes of decompensation. The first three categories are rated on a "five-point scale" from "none," through "mild," "moderate," "marked," and "extreme." 20 C.F.R. §§ 404.1520a(c)(4)(2011), 416.920a(c)(4)(2011).[13] The last area – episodes of decompensation – is rated on a "four-point scale": none, one or two, three, and four or more. *Id.* As set forth below, to satisfy a mental impairment listing, a claimant generally must exhibit "marked" impairment in at least two of the above areas or "repeated" episodes of decompensation. "The term repeated episodes of decompensation, each of extended duration in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." 20 C.F.R. § Pt. 404, subpt. P, App. 1 § 12.00(C)(4) (2015).

At step three, in order to show that he meets one of the listings for affective mental disorders (such as bipolar disorder), a claimant must show in part that he satisfies the so-called "paragraph B criteria" or "paragraph C criteria." The paragraph B criteria require at least two of

---

[13] As of January 17, 2017, the text of 20 C.F.R. § 416.920a (c)(4) and (c)(4) has been amended. The Commissioner now rates a claimant across "four broad functional areas," considering her ability to "[u]nderstand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." 20 C.F.R. § 416.920a (c)(3). In this Opinion and Order the Court applies the regulations as they existed at the time of the Commissioner's decision.

the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation. *See, e.g.*, 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 12.04(B)(2015).[14] The paragraph C criteria require a "[m]edically documented history of a chronic . . . disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support," and one of the following: (1) repeated episodes of decompensation, each for extended duration; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. *See, e.g.*, 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 12.04(C) (2015).

If the mental disorder does not qualify as a listed impairment under these standards, it may still qualify as a disability if the claimant's RFC does not allow him to perform the requirements of his past relevant work, or if his limitations, age, education, and work experience dictate that he cannot be expected to do any other work in the national economy. 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC is determined based on all of the relevant medical and other evidence in the record, including the claimant's credible testimony, objective medical evidence, and medical opinions from treating and consulting sources. 20 C.F.R. §§ 404.1520(e), 416.920(e); 404.1545(a)(3), 416.945(a)(3).

---

[14] As of January 17, 2017, the text of 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 12.04 has also been amended. In this Opinion and Order the Court applies the regulations as they existed at the time of the Commissioner's decision.

21

## B. Physical Impairments

### 1. Musculoskeletal System Disorders

"Disorders of the musculoskeletal system may result from hereditary, congenital, or acquired pathologic processes. Impairments may result from infectious, inflammatory, or degenerative processes, traumatic or developmental events, or neoplastic, vascular, or toxic/metabolic diseases." 20 C.F.R. Pt. 404, Subpt. P, app'x 1 § 1.00 (A) (2015). Disorders of the spine include degenerative disc disease. *Id.* § 1.04. The listing requires "compromise of a nerve root (including the cauda equine) or the spinal cord." *Id.* To qualify under the listing, one of the following must be present:

- (A) Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

- (B) Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

- (C) Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in an inability to ambulate effectively.

*Id.*

### 2. Genitourinary Disorders

When a claimant seeks benefits based on CKD, the relevant listings include various so-called "genitourinary disorders." 20 C.F.R. Pt. 404, Subpt. P, app'x 1 § 6.00 (A) (2015). These include CKD with impairment of kidney function (listing 6.05), nephrotic syndrome (listing 6.06), and complications of CKD (listing 6.09). To determine whether an impairment satisfies one of the genitourinary listings, the Commissioner requires evidence that spans at least 90 days and that

"documents the signs, symptoms, and laboratory findings of [claimant's] CKD," including laboratory findings "such as serum creatinine or serum albumin levels," which document kidney function. *Id.* § 6.00(B)(1). If the claimant's medical evidence includes eGFR findings, they will be considered pursuant to listing 6.05. *Id.* § 6.00(B)(2). Pathology reports documenting kidney or bone biopsies will also be considered, if available, for all genitourinary disorder listings. *Id.* § 6.00(B)(3). If an impairment does not meet the criteria of any genitourinary listing, the ALJ "must also consider whether [claimant] ha[s] an impairment(s) that satisfies the criteria of a listing in another body system." *Id.* § 6.00(D)(1).

To satisfy the listing for CKD with impairment of kidney function (listing 6.05), the medical evidence must show:

(A)   Reduced glomerular filtration evidenced by one of the following laboratory findings documented on at least two occasions at least 90 days apart during a consecutive 12-month period:

1.   Serum creatinine of 4 mg/dL or greater; or

2.   Creatinine clearance of 20 ml/min. or less; or

3.   [eGFR] of 20 ml/min/1.73m2 or less; AND

(B)   One of the following:

1.   Renal osteodystrophy . . . with severe bone pain and imaging studies documenting bone abnormalities, such as ostetis fibrosa, osteomalacia, or pathologic fractures; or

2.   Peripheral neuropathy . . . ; or

3.   Fluid overload syndrome . . . documented by [any one of four listed conditions]

To satisfy the listing for nephrotic syndrome (listing 6.06), the medical evidence must show:

(A)   Laboratory findings as described in 1 or 2, documented on at least two occasions at least 90 days apart during a consecutive 12-month period:

23

1. Proteinuria of 10.0g or greater per 24 hours; or

2. Serum albumin of 3.0 g/dL or less, and

   a. Proteinuria of 3.5g or greater per 24 hours; or

   b. Urine total-protein-to-creatinine ratio of 3.5 or greater; AND

(B) Anasarca [general swelling or massive edema] . . . persisting for at least 90 days despite prescribed treatment.

20 C.F.R. Pt. 404, Subpt. P, app'x 1 § 6.06 (2015); Medline Plus, *Swelling,* https://medlineplus.gov/ency/article/003103.htm (last visited May 18, 2017).

To satisfy the listing for complications of CKD (listing 6.09), the medical evidence must show "[c]omplications of [CKD] . . . requiring at least three hospitalizations within a consecutive 12-month period and occurring at least 30 days apart. Each hospitalization must last at least 48 hours, including hours in a hospital emergency department." 20 C.F.R. Pt. 404, Subpt. P, app'x 1 § 6.09 (2015).

As with mental impairments, if a genitourinary disorder does not qualify as a listed impairment under the standards, it may still qualify as a disability if the claimant's RFC does not allow him to perform the requirements of his past relevant work, or if his limitations, age, education, and work experience dictate that he cannot be expected to do any other work in the national economy. 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC is determined based on all of the relevant medical and other evidence in the record, including the claimant's credible testimony, objective medical evidence, and medical opinions from treating and consulting sources. 20 C.F.R. §§ 404.1520(e), 416.920(e); 404.1545(a)(3), 416.945(a)(3).

## V. THE ALJ'S DECISION

In his September 9, 2015 decision, ALJ Grossman correctly set out the five-step sequential evaluation discussed above. At the outset, ALJ Grossman found that Paredes was insured through

24

December 31, 2016. (R. 21.) But he concluded that Paredes had not been under a disability from February 23, 2013 through the date of the decision. (R. 19-29.)

At step one, the ALJ found that Paredes has not engaged in substantial gainful activity since the alleged onset date, February 23, 2013. (R. 21.)

At step two, the ALJ found Paredes has the following four "severe" impairments: bipolar disorder; schizoaffective disorder; CKD, Stage IV; and degenerative disc disease, lumbar spine. (R. 21.)

At step three, the ALJ found that Paredes's impairments did not meet or medically equal the criteria of any listed impairment. (R. 22.)

The ALJ considered four physical impairment listings: 1.04 (disorders of the spine), 6.05 (CKD, with impairment of kidney function), 6.06 (nephrotic syndrome), and 6.09 (complications of kidney disease). As to all four of them, he concluded, in a single, two-sentence paragraph, that the medical evidence of record "does not document signs, symptoms, or laboratory findings indicating any impairment or combination of impairments severe enough to meet or medically equal" the requirements of those listings. (R. 22.) The ALJ neither described nor discussed the individual elements of any of the relevant physical impairment listings.

The ALJ considered two mental impairment listings: 12.03 (schizophrenic, paranoid, and other psychotic disorders), and 12.04 (affective disorders). As to each, he concluded that the criteria for these listings had not been met. In making this determination, the ALJ relied on various treatment notes and consultative reports to find that Paredes did not meet the paragraph B criteria (R. 23) because he had only a "mild restriction" in his activities of daily living and "moderate difficulties" in social functioning and concentration, persistence, or pace. (R. 22-23.) In addition, the ALJ found that while Paredes had experienced one to two episodes of decompensation, "each

25

of extended duration," his remaining episodes of decompensation were not of sufficient duration. (R. 23.) The ALJ also found that the paragraph C criteria were not satisfied. *Id.*

At step four, the ALJ concluded that Paredes has the RFC to perform sedentary work, as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), limited to simple tasks and instructions and occasional contact with supervisors, coworkers, and the general public. (R. 23.)[15] To determine Paredes's RFC, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as opinion evidence from medical professionals. *Id.*

The ALJ followed the prescribed two-step process for assessing the credibility of testimony concerning Paredes's symptoms. First, he determined that there were underlying medically determinable physical and mental impairments that could reasonably be expected to produce Paredes's symptoms. (R. 23-24.) Next, he considered the intensity, persistence, and limiting effects of Paredes's symptoms to determine the extent to which they limit Paredes's functioning. (R. 24.) The ALJ specifically considered the credibility of the following: (i) Paredes's testimony that he was not able to stand or walk for more than 20 minutes at a time; (ii) Paredes's testimony that he had to elevate his legs when sitting and that he could not sit for long periods of time because of his back pain; (iii) Paredes's testimony that he has memory problems, which make him irritable; and (iv) Delasantos's testimony that Paredes exhibited erratic behavior when he did not take his

---

[15] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §§ 404.1567(a), 416.967(a).

medications. The ALJ concluded that these statements were "not entirely credible," *id.*, in light of the medical evidence, including opinions, in the record.

With respect to Paredes's mental health, the ALJ noted that "when medications were taken consistently, the claimant reported stable sleep, and good mood." (R. 24.) When Paredes "took [his] medications regularly," he had "no noticeable side effects," and his "[a]ttention, concentration, and memory was intact." *Id.* The ALJ considered but gave "little weight" to the opinion of Dr. Kirschtein, the FEGS psychiatrist who evaluated Paredes in June 2013, because that opinion "was not supported by the mental health treatment notes." (R. 25.) The ALJ accorded "moderate weight" to the opinion of Dr. Grubin, the FEGS physician who stated that Paredes required a low stress environment with a limited number of people. *Id.* As the ALJ noted, Dr. Grubin's opinion was "generally consistent" with the limitations incorporated into his own RFC assessment, which restricts Paredes to "simple tasks and instructions and limitations in contact and allowance to be off-task during the workday." *Id.*

The ALJ gave "some weight" to the opinion of Dr. Damari because, although Dr. Damari is a specialist who submitted a "detailed report with described clinical findings," her opinion was based only on a "one-time evaluation." (R. 25.) Finally, the ALJ accorded "partial weight" to the opinion of state agency psychologist, T. Harding. *Id.* Although his opinion was based on the limited medical evidence available at the time of his review on May 9, 2013, it was "not contradicted by new evidence and is supported by the clinical findings and opinion by Dr. Damari." *Id.* The ALJ did find, however, that the record supported more restrictions in Paredes's abilities to interact with others than Harding found. *Id.*

The record does not contain any medical source statements or other opinion evidence from Paredes's treating psychiatrists: Dr. Zilpert, Dr. Shah, and Dr. Danilov. Consequently, although

27

the ALJ considered the treatment notes recorded by those physicians (*see* R. 24), he could not consider, nor assign any weight to, their opinions.

Turning from Paredes's mental impairments to his physical challenges, the ALJ noted Paredes's "reports of low back pain, which was attributed to degenerative disc disease in the lumbar spine." (R. 26.) He concluded that "[a]lthough the claimant has received treatment for the allegedly disabling impairment, that treatment has been essentially routine and/or conservative in nature. Limitations from this impairment are adequately addressed by restricting the claimant to a reduced range of sedentary work." *Id.*

The ALJ also acknowledged that Paredes had CKD, which had been "slowly progressing since 2011," that his biopsy results "supported a diagnosis of nephropathy, chronic kidney stage IV," that he was on a transplant list, and that according to Dr. Uday, Paredes's "nephrology attending physician," he was not yet on dialysis but had gotten a fistula in preparation for dialysis. (R. 26.) On the other side of the ledger, the ALJ considered the opinion of medical expert Dr. Gussoff, who testified at the second hearing. In bold, underlined type, the ALJ wrote that Dr. Gussoff,

an impartial medical expert, testified that despite the claimant's diagnosis and stage of the chronic kidney disease, the laboratory reports do not indicate a need for dialysis, as earlier stated by the claimant's treating doctor. After a review of the records and upon hearing the claimant's testimony, the doctor stated that there was absent indications of polyuria, fainting, nor did the evidence indicate any limitations in the claimant's ability to perform the requirements of sedentary work. This testimony is accorded great weight, as the doctor was able to review the medical record in detail. Moreover, the doctor has an understanding of social security disability programs and evidentiary requirements. Most importantly, his opinion regarding the claimant's functional limitation is highly probative because he cited to numerous findings and laboratory reports in the record, which was discussed during the hearing and in this decision.

(R. 26.) The ALJ did not identify any particular findings upon which he, or Dr. Gussoff, relied in evaluating Paredes's CKD.

The ALJ also found it significant that Paredes "has engaged in a somewhat normal level of daily activity and interaction," including "taking the bus independently, performing household chores, walking for 30 minutes daily, and socializing." (R. 26.) Noting that "[s]ome of the physical and mental abilities and social interactions required in order to perform these activities are the same as those necessary for obtaining and maintaining employment," the ALJ reasoned that "[t]he claimant's ability to participate in such activities undermined the credibility of the claimant's allegations of disabling functional limitations." *Id.*

Finally, with respect to Paredes's physical impairments, the ALJ concluded that "the record does not contain any opinions from treating or examining physicians indicating that the claimant is disabled or has physical limitations greater than determined in the [RFC] . . . Given the claimant's allegations of totally disabling symptoms, one might expect to see some indication in the treatment records of restrictions placed on the claimant by a treating doctor. Yet a review of the record in this case reveals no restrictions recommended by the treating doctor." (R. 26-27.) The ALJ did not discuss the fact that there were no medical source statements in the record from Paredes's treating nephrologists, orthopedist, or internists, nor any other opinion evidence from them as to the claimant's functional limitations. Nor did he discuss his apparent change of position, between the first hearing and the second, as to whether Paredes should undergo a consultative examination regarding his physical impairments.

At step five, the ALJ found that Paredes is unable to perform his past relevant work as a security guard and cleaner, because those jobs require at least light exertional work, while Paredes is now limited to sedentary work. (R. 27.) Considering Paredes's age, education, work experience, RFC, and the vocational expert's testimony, however, the ALJ concluded that "there are jobs that exist in significant numbers in the national economy" that Paredes can perform, including the three

29

jobs identified by the vocational expert. (R. 27-28.) Accordingly, he found that Paredes has not been under a disability since his alleged onset date.

## VI. ANALYSIS

"This Court may set aside an ALJ's decision only where it is based upon legal error or where its factual findings are not supported by substantial evidence." *McClean v. Astrue*, 650 F. Supp. 2d 223, 226 (E.D.N.Y. 2009) (citing *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998)). Paredes contends that the ALJ erred in finding that he has the RFC to perform sedentary work, and in particular that he committed three underlying errors that, if remedied, would have led him to conclude that Paredes is disabled within the meaning of the Act. First, Paredes contends, the ALJ erred in granting "little" weight to Dr. Kirschtein (FEGS), "moderate" weight to Dr. Grubin (FEGS), and "great" weight to Dr. Gussoff. Pl. Mem. of Law, dated Apr. 25, 2016 (Dkt. No. 16), at 2-8. Second, claimant argues, the ALJ failed to sufficiently develop the record. *Id.* at 8-9. Third, according to Paredes, the ALJ failed to comply with the Social Security Administration's Hearings, Appeals, and Litigation Law Manual (HALLEX) I-2-6-52 when advising him of his right to representation. *Id.* at 10-12.

I dispose of the last point first. HALLEX sets forth safeguards and procedures for the agency's administrative proceedings, and section I-2-6-52(B) requires the ALJ to ensure that unrepresented claimants have been properly advised of their right to representation.[16] HALLEX is "simply a set of internal guidelines for the SSA, not regulations promulgated by the Commissioner," and therefore, a failure to follow HALLEX does not necessarily constitute legal error. *Harper v. Comm'r of Soc. Sec.*, 2010 WL 5477758, at *4 (E.D.N.Y. Dec. 30, 2010). *See also*

---

[16] In his brief, plaintiff incorrectly references HALLEX I-2-6-52(A) for the "advisement of the right to representation" requirement.

*Dority v. Comm'r of Soc. Sec.*, 2015 WL 5919947, at *5 (N.D.N.Y. Oct. 9, 2015) (quoting *Edwards v. Astrue*, 2011 WL 3490024, at *6 (D. Conn. Aug. 10, 2011)) ("The Second Circuit has not yet determined whether or not HALLEX policies are binding; however, other Circuits and district courts within the Second Circuit have found that 'HALLEX policies are not regulations and therefore not deserving of controlling weight.'"). Moreover, ALJ Grossman did explain that Paredes could adjourn the hearing and seek a lawyer, but Paredes chose not to. This is sufficient to satisfy HALLEX I-2-6-52(B), which states that "[t]he ALJ is not required to recite specific questions regarding the right to representation."

I agree, however, that the ALJ failed to properly develop the record concerning Paredes's kidney disease, failed to support his conclusion that plaintiff's CKD did not meet or medically equal the relevant listings, and gave too much weight to the opinion of Dr. Gussoff. Given the severity of the claimant's underlying condition, the undisputed evidence that he was a candidate for a kidney transplant, and the lack of any opinion evidence in the record from his treating nephrologists, the ALJ should have made an effort to obtain such evidence, or – at a minimum – obtained evidence from a consultative examiner. Instead, the ALJ relied almost exclusively on the opinion of Dr. Gussoff, who never examined the claimant and who appeared to overlook potentially relevant evidence in the record when reaching his conclusions about Paredes's RFC. In addition, the ALJ himself failed to discuss the relevant laboratory findings or otherwise provide an adequate roadmap for his conclusion that Paredes's CKD did not meet or medically equal the relevant listings.

## A. Duty to Develop the Record

### 1. Standard

"Whether the ALJ has met his duty to develop the record is a threshold question." *Hooper v. Colvin*, 199 F. Supp. 3d 796, 806 (S.D.N.Y. 2016). *See also Moran v. Astrue*, 569 F.3d 108, 112

(2d Cir. 2009) ("Before determining whether the Commissioner's conclusions are supported by substantial evidence, . . . [the court] must first be satisfied that the claimant has had a full hearing."). The record is fully developed if it is "complete and detailed enough to allow the ALJ to determine the claimant's" RFC. *Roman v. Colvin*, 2016 WL 4990260, at \*7 (S.D.N.Y. Aug. 2, 2016).

It is the ALJ's obligation to ensure that the record meets this standard. Particularly where the claimant is unrepresented, the ALJ must make an effort to obtain relevant documentary evidence. *See Thibodeau v. Comm'r of Soc. Sec.*, 339 Fed. App'x 62, 63-64 (2d Cir. 2009) (where pro se claimant lacked documentation concerning his work history, ALJ "should have helped Thibodeau cure that omission"); *Cruz v. Sullivan,* 912 F.2d 8, 11 (2d Cir. 1990) (quoting *Echevarria v. Sec'y of Health & Human Servs.,* 685 F.2d 751, 755 (2d Cir. 1982)) (when claimant is pro se, the ALJ must "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.") (internal quotation marks omitted)); *Jackson v. Colvin*, 2014 WL 4695080, at \*15 (S.D.N.Y. Sept. 3, 2014) (describing the "heightened obligation to ensure both the completeness and the fairness of the administrative hearing."). If the ALJ has failed to develop the record, the district court must remand the case for further development. *See, e.g.*, *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996).

Part of the ALJ's duty is to seek (or assist a pro se plaintiff to seek) a full report from the claimant's treating physicians. *See* 20 C.F.R. §§ 404.1513(b)(6) (2013), 416.913(b)(6) (2013) (the Commissioner "will request a medical source statement about what [the claimant] can still do despite [his or her] impairments). Thus, in *Hankerson v. Harris*, 636 F.2d 893, 896 (2d Cir. 1980), the appellate court held that a remand was required where the ALJ failed to "advise plaintiff that he should obtain a more detailed statement from his treating physician." *See also Price ex rel. A.N.*

32

*v. Astrue*, 42 F. Supp. 3d 423, 433 (E.D.N.Y. 2014) (remanding where ALJ denied application without obtaining opinions or records from treating doctor and psychiatrist); *Straw v. Apfel*, 2001 WL 406184, at \*3 (S.D.N.Y. Apr. 20, 2001) (holding that ALJ failed to provide a full and fair hearing where, *inter alia*, he failed to seek information or report from claimant's treating psychologist); *Jones v. Apfel*, 66 F. Supp. 2d 518, 524 (S.D.N.Y. 1999) (ALJ failed to sufficiently develop the record by neglecting to secure any report from claimant's treating physician); *Peed v. Sullivan*, 778 F. Supp. 1241, 1246 (E.D.N.Y. 1991) (remanding for failure to secure opinion from treating physician).

"The duty to develop the record goes hand in hand with the treating physician rule, which requires the ALJ to give special deference to the opinion of a claimant's treating physician." *Batista v. Barnhart*, 326 F. Supp. 2d 345, 353 (E.D.N.Y. 2004). An ALJ cannot, of course, pay deference to the opinion of the claimant's treating physician if no such opinion is in the record. Thus, "[c]onsideration of the duty to develop the record, together with the treating physician rule, produces an obligation that encompasses the duty to obtain information from physicians who can provide opinions about the claimant. The ALJ must make reasonable efforts to obtain a report prepared by a claimant's treating physician even when the treating physician's underlying records have been produced." *Santiago v. Comm'r of Soc. Sec.*, 2014 WL 3819304, at \*17 (S.D.N.Y. Aug. 4, 2014); *see also Molina v. Barnhart*, 2005 WL 2035959, at \*6 (S.D.N.Y. Aug. 17, 2005) (ALJ must "make every reasonable effort to obtain not merely the medical records of the treating physician but also a report that sets forth the opinion of [ ] that treating physician as to the existence, the nature, and the severity of the claimed disability") (internal quotation marks omitted); 20 C.F.R. §§ 404.1512(d) (2015), 416.912(d) (2015) (the ALJ shall make "every reasonable effort" to obtain from the individual's treating physician all medical evidence necessary

prior to requesting medical evidence from any other source on a consultative basis). Furthermore, "[b]ecause '[t]he expert opinions of a treating physician as to the existence of a disability are binding on the fact finder,' it is not sufficient for the ALJ simply to secure raw data from the treating physician. What is valuable about the perspective of the treating physician – what distinguishes him from the examining physician and from the ALJ – is his opportunity to develop an informed *opinion* as to the physical status of a patient." *Peed*, 778 F. Supp. at 1246.

"That said, the Second Circuit has clarified that 'remand is not always required when an ALJ fails in his duty to request opinions,' particularly where 'the record contains sufficient evidence from which an ALJ can assess [claimant's] residual functional capacity.'" *Rivera v. Comm'r of Soc. Sec.*, 2015 WL 6619367, \*11 (S.D.N.Y. Oct. 30, 2015) (quoting *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. Apr. 2, 2013) (summary order)); *see also Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x 82, 84 (2d Cir. 2015) (summary order) ("Given the extensive medical record . . . we hold that there were no 'obvious gaps' that necessitate remand solely on the ground that the ALJ failed to obtain a formal opinion from one of [claimant's] treating physicians" with respect to one functional domain). "[C]ourts in this District have found that 'it is not *per se* error for an ALJ to make a disability determination without having sought the opinion of the claimant's treating physician.'" *Rivera*, 2015 WL 6619367, \*11 (quoting *Sanchez v. Colvin*, 2015 WL 736102, at \*5 (S.D.N.Y. Feb. 20, 2015)).

## 2. Application to RFC Determination

The Commissioner argues that ALJ Grossman was not required to take further action to develop the record under *Tankisi* and its progeny "since the ALJ already had Dr. Gussoff's well-supported opinion, together with Plaintiff's extensive treatment records." Pl. Br. at 23 (citing *Swiantek*, 588 F. App'x at 84; *Tankisi*, 521 F. App'x at 34; and *Pellam v. Astrue*, 508 F. App'x 87, 90 n.2 (2d Cir. 2013)). However, in this case, "[u]nlike in *Tankisi*, the medical records before the

ALJ . . . do not 'include an assessment of [Paredes's] limitations from a treating physician.'" *Sanchez*, 2015 WL 736102, at \*6 (quoting *Tankisi*, 521 F. App'x at 33-34). Consequently, Dr. Gussoff's opinion "do[es] not provide enough . . . information to allow the ALJ to make the necessary inference that the Plaintiff could perform" sedentary work. *Brady v. Colvin*, 2016 WL 1448644, at \*9 (E.D.N.Y. Apr. 12, 2016).

The only physician to opine on Paredes's exertional (physical) limitations here was Dr. Gussoff, a non-examining medical expert who based his opinion – that Paredes is capable of performing sedentary work – entirely on his review of non-opinion medical records from the claimant's treating physicians and the claimant's testimony at the second of his two hearings. (R. 76-77.) In his written decision, the ALJ stated that Dr. Gussoff's opinion was "highly probative" because he "cited to numerous," albeit unspecified, "findings and laboratory reports." (R. 26.) However, Dr. Gussoff only mentioned two underlying exhibits during his testimony.[17] Moreover, none of the "findings and laboratory reports" in the record even discussed Paredes's functional limitations resulting from his CKD. Thus, Dr. Gussoff's opinion was "not sufficiently detailed to support the ALJ's RFC determination." *La Torre v. Colvin*, 2015 WL 321881, at \*12 (S.D.N.Y. Jan. 26, 2015) (collecting cases). Here, as in *La Torre*:

Although they discuss symptoms, diagnoses and treatment plans, [claimant's] treatment records do not explain or assess the scope of h[is] work-related capabilities. No treating medical source opined on [claimant's] ability to perform the tasks associated with [sedentary] work. Unlike the ALJ in [*Tankisi*], [ALJ

---

[17] During his hearing testimony Dr. Gussoff identified "Exhibit 7-F" (BLHC medical records from September 16, 2011 through April 3, 2013) and "Exhibit 14" (medical records from Metropolitan Hospital Center, dating from 2009 to 2011) as bases for his conclusions. (R. 75, 79, 82.) He did not discuss any other findings or laboratory reports. Dr. Gussoff also noted, several times, that his opinion was based on the absence of evidence that would support more significant limitations rather than the presence of evidence that would support his own opinion. (*See, e.g.*, R. 77 ("I don't have any evidence that he has what is called polyuria, frequent urination"), R. 79 ("[t]here's no evidence of anemia")). Moreover, as noted above, Dr. Gussoff was mistaken when he said he had no evidence regarding polyuria. (*See* R. 348-50.)

Grossman] did not have even an informal assessment of [claimant's] limitations on which to rely in making his determination.

2015 WL 321881, at \*12. Despite the gaps in the record, ALJ Grossman "did not contact any of [Paredes's] treating physicians for further information" concerning Paredes's ability to perform sedentary work. *Bush v. Colvin*, 2017 WL 1493689, at \*6 (S.D.N.Y. Apr. 26, 2017). Nor did he schedule a consultative examination with a nephrologist or internist. This failure requires remand for further proceedings.

## B.  Substantial Evidence

The ALJ also failed to provide sufficient support for the findings in his decision as they pertain to Paredes's physical impairments. A determination of the ALJ may be set aside if it is not supported by substantial evidence. *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008); *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "[I]n order to accommodate 'limited and meaningful' review by a district court, the ALJ must clearly state the legal rules he applies and the weight he accords the evidence considered." *Rivera v. Astrue*, 2012 WL 3614323, at \*8 (E.D.N.Y. Aug. 21, 2012) (citation omitted). An ALJ who fails to provide an adequate roadmap for his reasoning deprives the court of the ability to determine accurately whether his opinion is supported by substantial evidence; in these cases, remand is appropriate. *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999); *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

ALJ Grossman failed to provide a roadmap for his decision that Paredes does not have a physical impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. In fact, the ALJ did not set forth *any* reasoning for this decision,

other than the conclusory statement that "the medical evidence of record does not document signs, symptoms, or laboratory findings indicating any impairment or combination of impairments severe enough to meet or medically equal the requirements of Listings 1.04, 6.05, 6.06, and 6.09." (R. 22.)

To the extent the Court may surmise that the ALJ relied on Dr. Gussoff's testimony in concluding that Paredes's CKD did not meet or medically equal the severity of one of the listed genitourinary disorders, the Court finds that testimony deficient. Dr. Gussoff testified repeatedly about Paredes's near-normal BUN levels, and the fact that Paredes was not on dialysis, and appears to have based his opinion largely on those facts. (*See* R. 74-83.) However, the genitourinary disorder listings, at the time of the ALJ's decision, did not turn on the claimant's BUN levels. Listing 6.05, for example, required laboratory findings showing serum creatinine of 4 mg/dL or greater, creatinine clearance of 20 ml/min. or less, or eGFR of 20 ml/min/1.73m2 or less. 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 6.05 (2015). Neither Dr. Gussoff nor the ALJ ever mentioned Paredes's creatinine or eGFR levels. *Cf. Nunez v. Barnhart*, 2007 WL 313459 (S.D.N.Y. Feb. 1, 2007) (medical expert testified at hearing that claimant's creatinine levels were normal). This gap in the analysis is particularly troubling given that Paredes's treatment records appear to show eGFR levels of less than 20ml/min on two occasions almost a year apart. (*See* R. 573 (eGFR of 19.35 ml/min on January 29, 2014); R. 812 (eGFR of 16.03 ml/min on January 15, 2015)). Consequently, the Court finds that the ALJ's opinion concerning whether Paredes suffered from a physical impairment that met or equaled listings 6.05, 6.06, and 6.09, the opinion was not supported by substantial evidence and the case must be remanded for further proceedings.

37

## VII. CONCLUSION

For the foregoing reasons, the Commissioner's motion is DENIED, plaintiff's motion is GRANTED, and this action is REMANDED to the Commissioner for further proceedings consistent with this Opinion and Order.

Dated: New York, New York
       May 19, 2017

SO ORDERED.

**BARBARA MOSES**
**United States Magistrate Judge**

38